ASHLEY CREEK PHOSPHATE CO.,
a Utah corporation, Plaintiff,

v.

CHEVRON et al., Defendants.

No. 2:89CV554.

United States District Court,
D. Utah,
Central Division.

July 14, 2000.

Gary F. Bendinger, Richard W. Giauque, Bendinger Crockett Peterson & Casey, Salt Lake City, UT, Melvin Goldstein, Goldstein & Claxton PC, Washington, DC, Craig Smay, Salt Lake City, UT, William L. Miller, Goldstein & Assoc., Washington, DC, for Ashley Creek Phosphate Co.

Sandy J Mooy, Public Service Commission, Salt Lake City, UT, Carol Clawson, Snell & Wilmer LLP, Salt Lake City, UT, Philip C Pugsley, Utah Attorney General's Office, Salt Lake City, UT, Charlene Barlow, R. Wayne Klein, Utah Attorney General's Office, Salt Lake City, UT, for State of Utah.

Judith A Albert, Thomas J. Stilling, Surface Transportation Board, Office Of The General Counsel, Washington, DC, for Surface Transportation Bd.

E Scott Savage, Berman Gaufin Tomsic Savage & Campbell, Salt Lake City, UT, Robert A. Peterson, Bendinger Crockett Peterson & Casey, Salt Lake City, UT, for Chevron, USA, Inc.

William H. Adams, Young Adams & Hoffman Llp, Salt Lake City, UT, for SF Pipeline Ltd., SF Phosphates Ltd.

Peter W. Billings, Jr, Douglas B Cannon, Fabian & Clendenin, Salt Lake City, UT, Lowry Snow, Snow & Jensen, St George, UT, Wayne B. Slaughter, Jr., JR Simplot, Boise, ID, for J.R. Simplot Co., FS, Inc.

James S. Jardine, Jonathan A. Dibble, Cameron M Hancock, Ray Quinney & Nebeker, Salt Lake City, UT, Edmond S.

Gross, Kansas City, MO, for Farmland Industries.

### AMENDED MEMORANDUM DECISION AND ORDER

KIMBALL, District Judge.

This matter is before the court on Defendants Farmland Industries, Inc., J.R. Simplot Company, SF Phosphates Limited Company, SF Pipeline Limited Company, and FS, Inc.'s (collectively the "SF Defendants") Motion for Summary Judgment. A hearing on that motion was held on June 14, 2000. At the hearing, the SF Defendants were represented by Peter W. Billings and James S. Jardine. Plaintiff Ashley Creek Phosphate Company ("Ashley Creek") was represented by E. Craig Smay. Before the hearing, the court considered carefully the memoranda and other materials submitted by the parties, including the Surface Transportation Board Decision, No. 40131 (Sub–No. 1), dated October 28, 1996 (the "STB Decision") and the Memorandum Decision Addressing SF Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, issued by Judge David Sam on June 19, 1998 ("Judge Sam's Decision"). Since taking the matter under advisement, the court has further considered the law and the facts relating to this motion. Now being fully advised, the court renders the following Amended Memorandum Decision and Order.

### BACKGROUND

#### A. *BACKGROUND REGARDING THE CASE*

This suit pertains to Ashley Creek's efforts to use a pipeline to carry phosphate, used primarily in the manufacture of phosphate fertilizer, from fields in Vernal to a rail junction in Rock Springs (the "Pipeline"). The fields in Vernal are presently owned by the SF Defendants-who purchased the fields from Chevron in 1992-and the State of Utah. In 1974, Ashley Creek purchased the right to mine the State's holdings.

Ashley Creek maintains that the Pipeline is the only way to transport phosphate from Vernal to a plant because: (1) easements for another pipeline will not be issued by the federal government due to the environmental sensitivity of the land, and (2) the State of Utah will no longer issue overweight trucking permits for transportation by truck due to the damage such trucking causes (which is the factor that led Chevron to construct the Pipeline in the first place).

The Pipeline was owned and controlled by Chevron at the time it began operating in 1986. Chevron obtained the rights-of-way necessary to construct the Pipeline by assuring various federal agencies that it would operate the line as a common carrier. However, once the Pipeline was built, Chevron refused to publish a tariff until it was ordered to do so in 1989 by the Interstate Commerce Commission ("ICC"), which was acting in response to a complaint filed by Ashley Creek.

Ashley Creek responded to the tariff by filing this antitrust lawsuit, alleging, among other things, that the tariff is outrageous and violates the essential facilities doctrine of Sections 1 and 2 of the Sherman Act. The reasonableness of Chevron's rates was referred to the ICC by the district court. On April 17, 1992, while the ICC proceeding was still pending, Chevron sold its Vernal phosphate fields, its Rock Springs plant, and the Pipeline to entities formed by J.R. Simplot Company and Farmland Industries, Inc.—the "SF Defendants." The SF Defendants continued the tariff and were joined as defendants.

In 1996, the Surface Transportation Board, ("STB") (successor to the ICC) issued a ruling, finding that the tariff was unreasonable at many volumes. Specifically, the STB ruling sets forth a formula that enables the SF Defendants, as the owners of the Pipeline, to recover the cost of constructing ($35 million) and operating the Pipeline, plus a reasonable rate of return. The formula allows the SF Defendants to recover the construction costs on a flat rate per ton, as opposed to an accel-

erated rate of depreciation, as the SF Defendants advocated, or a flat rate per year, as Ashley Creek advocated. For this reason, it is impossible to determine whether the tariff "over-recovers" until the total volume of phosphate shipped during the life of the Pipeline is known or assumed. Once the total volume is known or assumed, the depreciation per ton can be determined and a calculation made of a specific amount recovered for each month, depending on that month's known or assumed volume. The STB applied the formula to two different hypothetical sets of volumes and concluded that the tariff over-recovered, that is, was unreasonable, at many volumes.

After the STB issued its decision, the SF Defendants moved to dismiss Ashley Creek's lawsuit on the grounds that, assuming Ashley Creek shipped its projected quantities, there would he no over-recovery during the 14–year period that the SF Defendants owned the Pipeline. Judge Sam denied the motion, primarily on the ground that a 20–year period must be utilized.

The SF Defendants then established a new tariff (effective January 1, 1999), which they claim results in a net under-collection of $3.3 to $5.4 million over the Pipeline's 20–year life. The SF Defendants claim that the new tariff provides only for recovery of operating and fixed costs and does not recover the $35 million construction costs.

### B. BACKGROUND REGARDING THE PRESENT MOTION

The SF Defendants seek summary judgment on all of Ashley Creek's claims directed toward them.[1] First, they have moved for summary judgment on Counts I through IX of the Second Amended Complaint (the antitrust claims) on two independent grounds. First, the SF Defendants claim that, as a matter of law, Ashley Creek does not have standing to bring antitrust claims for two reasons. The SF Defendants contend that Ashley Creek cannot show that it is prepared to enter any of the markets identified in the Second Amended Complaint. In addition, the SF Defendants claim that Ashley Creek has admitted that the tariff in place during the SF Defendants' involvement with the Pipeline is not the reason for Ashley Creek's failure to develop its property. Thus, the SF Defendants argue that, as a matter of law, there is no causal nexus between the alleged violation and any alleged damage to business or property under the antitrust laws. As a second independent basis for summary judgment, the SF Defendants contend that the tariff charged by them is, as a matter of law, reasonable and cannot be the basis for exclusionary conduct.

The SF Defendants have also moved for summary judgment on Counts X and XII. Both of these claims are based on the SF Defendants' obligation under the Federal Land Policy and Management Act ("FLPMA"). According to the SF Defendants, the Tenth Circuit has recognized that no private cause of action exists under FLPMA for Ashley Creek, and there is no evidence that the tariff has affected any alleged easement by necessity in favor of Ashley Creek.

Finally, the SF Defendants have moved for summary judgment on Count XI, which is a state law nuisance claim. Because there is no diversity between Ashley Creek and the SF Defendants, and if the federal claims are dismissed, the SF Defendants claim that this state law claim should also be dismissed.

### STANDARD OF REVIEW

A motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure is appropriate when the pleadings, depositions, and affidavits on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The movant bears an initial burden to demonstrate an absence of evidence to support an essential element of the non-movant's

---

1. The Chevron Defendants have not moved for summary judgment.

case. If the movant carries this initial burden, the burden then shifts to the non-movant to make a showing sufficient to establish that there is a genuine issue of material fact regarding the existence of that element.[2] *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). While the non-movant is entitled to the benefit of whatever reasonable inferences there are in its favor, the reasonableness of those inferences is scrutinized in light of the undisputed facts. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine dispute exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there is no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505 (emphasis in original).

## DISCUSSION

### I. DOES ASHLEY CREEK HAVE STANDING TO BRING ANTITRUST CLAIMS?

Ashley Creek claims that the tariff on the Pipeline prevented Ashley Creek from entering both the market for phosphate concentrate and the market for phosphate fertilizer.[3] The SF Defendants claim that Ashley Creek does not have standing to bring such claims because Ashley Creek was not prepared to enter the relevant markets and because there is no causal nexus between the alleged antitrust violation and the alleged damage.

The Tenth Circuit has repeatedly held that standing is a question of law to be decided by the court. *See, e.g., Curtis v. Campbell–Taggart, Inc.,* 687 F.2d 336, 338 (10th Cir.1982), *cert. denied,* 459 U.S. 1090, 103 S.Ct. 576, 74 L.Ed.2d 937 (1982); *Motive Parts Warehouse v. Facet Enter.,* 774 F.2d 380, 389 (10th Cir.1985). To have standing to bring such claims, Ashley Creek must satisfy a two-pronged test: it must have an antitrust injury, and there must be a direct causal connection between that injury and the alleged violation of the antitrust laws. *See Sports Racing Serv. Inc. v. Sports Car Club of Amer., Inc.,* 131 F.3d 874, 882 (10th Cir.1997). Ashley Creek is not, and has never been, in the business of either (1) mining and selling phosphate concentrate or (2) manufacturing and selling phosphate fertilizer. Thus, to have an "antitrust injury," a plaintiff not already in the allegedly injured market must have both "manifested an intention to enter" *and* "demonstrated a preparedness to do so." [4] *See, e.g., Sports Racing Serv. Inc.,* 131 F.3d at 882; *Curtis,* 687 F.2d at 338.

The Tenth Circuit, like other circuits, has identified four "key elements" in

---

**2.** Ashley Creek did not refer the court to any material facts that it claims are in dispute; rather, it simply provided its own statement of undisputed facts, which does not comport with the requirements of DUCivR 56–1(b). Technically, under DUCivR 56–1(c), all of the SF Defendants' facts should be deemed admitted for purposes of summary judgment. However, the court in conducting its analysis, has made an attempt to evaluate whether Ashley Creek has created a genuine issue regarding any material facts.

**3.** The SF Defendants point out that Ashley Creek also asserts a claim for antitrust viola-

tions in the "transportation of phosphate rock concentrate" market. The SF Defendants point out, and the court agrees, that there is absolutely no evidence that Ashley Creek was prepared to enter the phosphate fertilizer market or the transportation of phosphate market, assuming such a market exists. Thus, the bulk of the analysis pertains to the phosphate concentrate market.

**4.** The court has assumed that Ashley Creek has manifested its intention to enter the relevant markets.

evaluating preparedness: (1) ability to finance, (2) consummation of contracts, (3) affirmative action to enter the market, and (4) background and experience in the particular business. *See Curtis*, 687 F.2d at 338; *Go–Video, Inc. v. Matsushita Elec. Indus. (In re Dual–Deck Video Cassette Recorder Antitrust Litigation)*, 11 F.3d 1460, 1465 (9th Cir.1993); *Martin v. Phillips Petroleum Co.*, 365 F.2d 629, 633–34 (5th Cir.1966), *cert. denied*, 385 U.S. 991, 87 S.Ct. 600, 17 L.Ed.2d 451 (1966). Courts have held that preparedness requires a showing of "concreteness" that demonstrates the ultimate success of the proposed business:

> Uniformly, the courts have drawn the line at the point where promotion transcends the level of hopes, desires, and expectations, and reaches a certain state of maturity and concreteness, a state where it is accompanied by certain indicia of ultimate success. Put another way, the courts have held that a potential competitor cannot achieve standing merely by demonstrating his intention to enter a field; he must also demonstrate his preparedness to do so.

*Hecht v. Pro–Football, Inc.*, 570 F.2d 982, 994 (D.C.Cir.1977), *cert. denied*, 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978).

1. *Is Ashley Creek Prepared to Enter the Relevant Markets?*

■ The testimony of John Archer ("Archer"), Ashley Creek's president and principal shareholder, as well as its mining engineer, shows that Ashley Creek not only fails all four tests, but it has failed to determine whether there is a market for phosphate rock concentrate at the price that Ashley Creek would have to charge to cover its costs.

Specifically, Ashley Creek itself estimates that the cost to enter the phosphate concentrate market was in excess of $67 million in 1992, and the cost to enter the phosphate fertilizer market was an additional $187 million. Archer testified that Ashley Creek has only a thousand dollars to its name and has done nothing to obtain financing. To obtain the necessary financing, Archer testified that Ashley Creek would need a "Type 3 or 4" feasibility study. However, Ashley Creek has conducted only a "Type 1" study. Archer also admitted that to obtain financing, Ashley Creek would also need signed contracts with customers to purchase Ashley Creek's products at a specified price, but that Ashley Creek has never discussed price with any potential customer, let alone obtained a signed contract specifying the price.

Even more fundamental than a lack of financing, Ashley Creek has not taken the basic affirmative steps toward entering such capital intensive markets. With respect to the phosphate fertilizer market, all Ashley Creek has done is *consider* constructing a fertilizer plant, which is not enough.[5] As for the phosphate concentrate market, Ashley Creek has had only a "Type 1" feasibility study done, which describes how Ashley Creek would mine, mill, and ship phosphate. According to David Aro ("Aro"), the consulting mining engineer who prepared the study in 1985, a Type 1 feasibility study is very preliminary and "is seldom adequate for positive acceptance of a project." Based on this study, Ashley Creek knows what its own costs would be only within a margin of plus or minus 25%. Ashley Creek does not know the cost to ship its concentrate from the end of the pipeline to its potential customers. Ashley Creek does not know whether there are any customers who would buy concentrate at the price Ashley Creek would have to charge even if the Pipeline tariff were zero.[6] While Ashley Creek claims that the tariff is too high, it does not know whether it could profitably

---

**5.** Moreover, in 1987, Archer testified under oath in an ICC proceeding that Ashley Creek had no intention of entering the phosphate fertilizer market.

**6.** The SF Defendants contend that the experience of others actually in the market demonstrates that there is, in fact, no market for Vernal phosphate concentrate beyond what the currently operating fertilizer plant at Rock Springs can use.

ship at the actual tariff rates or indeed at *any* tariff rate.

Merely knowing that there are phosphate deposits on its leases is not sufficient to demonstrate that Ashley Creek is prepared to enter the market. *See Practice Perfect Inc. v. Hamilton County Pharm. Ass'n,* 732 F.Supp. 798, 803 (S.D.Ohio 1989) (holding plaintiff's principals failed to identify a sufficient market for their services which was an essential element for the success of their proposed business); *Gas Utilities Co. of Ala., Inc. v. Southern Natural Gas Co.,* 825 F.Supp. 1551, 1572 (N.D.Ala.1992), *aff'd,* 996 F.2d 282 (11th Cir.1993) (finding that plaintiff lacked preparedness to enter market because *inter alia* "[t]here [was] no evidence of a plan whereby plaintiff could successfully undercut [defendant's] prices and have the financial ability to repay loans."). Even Aro, Ashley Creek's consulting mining engineer who prepared the Type 1 feasibility study, wrote the following notes in October 1993:

> I have felt for some time that the level of *legal effort* far exceeds the level of *technical data* that is essential to verifying the reserves and costs.
> Without "proven" reserves and "acceptable" costs, the legal arguments could be "hypothetical and meaningless."
> At the present time -
> 1–No proven reserves, only prob. and prosp.
> 2–No detailed estimate of acceptable capital costs and operating costs
> 3–No definition of metallurgy needed for conceptual plant design
> Pipeline tariff—only *ONE* of many cost factors—If in range of $3.00 to $4.00, no problem—other technical data acquisition can proceed !!

Ex. 59 to the Memorandum in Support of the SF Defendants' Motion for Summary Judgment ("SF Defendants' Memo in Support")(emphasis in original). Aro's concerns were valid.

Finally, the SF Defendants argue that Ashley Creek does not have the back-ground or experience to enter the market for the mining, milling, and sale of phosphate concentrate. The court agrees. Archer, Ashley Creek's only officer has never had any experience in mining, milling, or selling phosphate concentrate. The other officers, Aro and Craig Smay, have resigned. Whatever experience Archer may have had in buying and selling phosphate *reserves,* that is not experience in mining and selling phosphate concentrate.

Ashley Creek contends that it need not have completed any step that would have been rendered useless by Defendants. Ashley Creek cites several cases for this proposition. For example, in *Thompson v. Metropolitan Multi–List, Inc.,* 934 F.2d 1566, 1572 (11th Cir.1991), the court stated that:

> [A] defendant cannot benefit by the application of the standing doctrine from the fact that it is able to prevent the plaintiff from becoming a consumer of its product. As long as the plaintiff made a reasonable attempt to enter the market, . . . the plaintiff has standing to contest antitrust violations which create barriers to that market.

Similarly, in *Fleer Corp. v. Topps Chewing Gum, Inc.,* 415 F.Supp. 176, 179 (E.D.Pa. 1976), the court held:

> We cannot find that [plaintiff's] steps toward entry were insubstantial if it is true that the taking of any further steps would have been a sheer waste of resources. It would be inconsistent with one purpose of the Clayton Act-to protect the business interests of victims of monopolistic practices-to require an antitrust plaintiff to pay a courtroom entrance fee in the from of an expenditure of substantial resources in a clearly futile competitive gesture.

Ashley Creek claims that any further steps that it might have taken would have been futile.

Even assuming that is a correct statement of the law,[7] Ashley Creek does not

---

**7.** The Tenth Circuit has not addressed the question, but the Fifth Circuit has held the

opposite. In *Jayco Sys., Inc. v. Savin Bus.*

meet the factual predicate. Ashley Creek claims that defendants withheld information that prevented Ashley Creek from obtaining financing. However, the only information that was allegedly withheld was *Chevron's* delay in publishing a tariff. That is the conduct of Chevron, not the SF Defendants. Moreover, Chevron remedied whatever harm it caused by publishing a tariff in 1989. Even after Archer knew what the tariff would be, he testified that he did nothing to determine whether it was economically feasible to sell under the new $4.60 tariff. The margin of error (+/ $9.00) for Ashley Creek's costs is greater than the entire third tariff of $4.60, let alone the margin by which Ashley Creek claims the tariff is unreasonable. In sum, Ashley Creek does not know "whether it could profitably sell phosphate concentrate" at the third tariff rate.

Even assuming the rate was too high, the SF Defendants did not prevent Ashley Creek from determining (1) what price customers would pay; (2) the freight costs to ship from Rock Springs; or (3) its own costs with sufficient precision to know whether a few dollars difference in the tariff would make any difference. Ashley Creek admits that it "has never done any analysis to determine whether the tariffs have in fact prevented Ashley Creek from selling its product or developing its project." Thus, Ashley Creek has failed to create a genuine dispute regarding whether the tariffs prevented it from preparing to enter the market. Furthermore, Archer's testimony confirms that the tariffs had very little, if anything, to do with Ashley Creek's failure to enter the market. Archer has testified that he will not go forward without owning 40% of the Pipeline, thus precluding Ashley Creek's claim that the tariff is an excuse for not proceeding with preparation for its project. Since March 1997 there has been a settlement agreement (the "SITLA Agreement") between

the State of Utah and SF Pipeline that guarantees that the tariff will not be raised. Since January 1999, the fourth tariff recovers only operating and new capital costs and no original capital costs. Despite guaranteed access and a tariff that will never exceed operating costs, Ashley Creek has still not prepared to enter the market.

Thus, the court finds that Ashley Creek was not and is not prepared to enter any of the relevant markets, and its antitrust claims are dismissed on that basis.

### 2. *Is There a Nexus Between the Alleged Injury and Alleged Violation of Antitrust Laws?*

■ Ashley Creek cannot satisfy the second prong of the standing requirement because its own admissions make it impossible to show a causal nexus between the alleged violation (an unreasonable tariff) and the alleged injury (exclusion from the market). The same evidence discussed above demonstrates that there is no causal connection between the alleged violation and the alleged injury. First, Ashley Creek does not know (1) the amount by which the tariff is unreasonable, (2) the price any customer would pay, (3) the freight from Rock Springs, or (4) at what tariff rate, if any, Ashley Creek could profitably ship and sell its concentrate. Moreover, Archer testified that whatever the tariff, he will not go forward with his project until he obtains an equity interest in the Pipeline. Thus, he has testified that the tariff did not make any difference.

Accordingly, the court finds that there is no causal nexus between the alleged violation and the alleged injury, and Ashley Creek's antitrust claims are dismissed on that basis.

*Mach. Corp.*, 777 F.2d 306, 314 (5th Cir. 1985), the court held that it was "not dispositive" that the defendant would not have dealt with plaintiff *even if* the plaintiff had satisfied the four elements regarding preparedness.

"Rather, the question is whether, assuming Savin had been willing to supply Jayco with the necessary machines, Jayco would have been prepared to bid them."

### C. Does Ashley Creek Have Standing Based on Alleged Injury to Its Leases?

 Ashley Creek argues that it has standing because this court has already determined that injury to Ashley Creek's property-its leases-confers standing without regard to injury to business. Section 4 of the Clayton Act provides standing to anyone "injured in their business or property by reason of anything forbidden in the antitrust laws." Ashley Creek argues that "Defendants' failure to provide plaintiff's leaseholds with the access to market to which they were statutorily entitled decreased the value of the leaseholds, and that, as a result, plaintiff has standing to assert the injury to its property."

In Judge Sam's Decision, he did not rule that Ashley Creek has standing on this basis. In a previous motion to dismiss, the SF Defendants argued that Ashley Creek did not have standing to complain about a conspiracy to raise prices for phosphate concentrate since Ashley Creek was not intending to be a buyer but a seller of concentrate. The SF Defendants did not raise, and Judge Sam did not address, the issue of whether Ashley Creek was prepared to enter the market.

The court disagrees that Ashley Creek has standing solely by virtue of its mineral leases. The mineral leases (for which Archer or Ashley Creek now pays a little over $11,000 per year) is only one minor component in the development of a project that Ashley Creek admits would have cost $67 million in capital in 1990. Because Ashley Creek has not established the necessary steps to show its viability in that market, it would be too speculative and remote to recognize the leasehold interest as being injured. The mineral leases only hold value if the minerals can be economically mined, milled, and sold. Without showing that its leases could be developed economically, Ashley Creek can only speculate on the leases' value. Accordingly, Ashley Creek does not have standing to bring antitrust claims on the basis of an alleged injury to its leases.

### II. ARE THE SF TARRIFFS REASONABLE AND NON-EXCLUSIONARY?

Ashley Creek has claimed that the tariffs for the Pipeline were not reasonable and that the SF Defendants' claim that their fourth rate retroactively makes the other tariffs reasonable is unsupported by any authority. It also argues that a retroactively reasonable rate is irrelevant to antitrust liability. In contrast, the SF Defendants argue that based on Ashley Creek's "best case" start date of 1989 and the fourth tariff implemented effective January 1, 1999 (which will not be increased during the relevant period except to recover increased operating costs or capital costs), the court cannot rule that the tariffs were exclusionary. The SF Defendants contend that this is another independent basis on which the court can find that Ashley Creek has no standing to bring antitrust claims. The SF Defendants argue, and the court agrees, that using the most current data available to determine if the tariffs are reasonable is precisely the approach adopted by the STB and is consistent with the stand alone cost ("SAC") method of evaluating rates.

The SF Defendants adopted the same third tariff that had been in place since February 28, 1992. Assuming Ashley Creek shipped its claimed volume of 1.085 million tons per year in addition to what SF was shipping, the tariff generally would have been $4.60 per ton. Effective January 1, 1999, the SF Defendants adopted a fourth and still lower tariff, which collects only variable and fixed costs and provides no recovery for original construction costs or the cost of capital. Assuming Ashley Creek shipped its claimed volume of 1.085 million tons per year in addition to what SF was shipping, the tariff generally would have been approximately $2.15 for 1999.

 The court has already ruled (1) that the STB did not hold that the SF Defendants tariffs were unreasonable, and (2) unreasonable does not necessarily mean exclusionary. As explained below,

the court finds that the SF Defendants's tariffs were not unreasonable, and thus, they were not exclusionary. First, the United States Supreme Court has long held that a private antitrust action cannot be maintained based upon a lawful rate filed with the ICC (now the STB). *Keogh v. Chicago & N.W.R. Co.,* 260 U.S. 156, 162–65, 43 S.Ct. 47, 67 L.Ed. 183 (1922); *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.,* 476 U.S. 409, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986); *see also Pinney Dock & Transp. Co. v. Penn Cent. Corp.,* 838 F.2d 1445 (6th Cir.1988). Thus, if the SF Defendants' rates were reasonable under the methodology employed by the STB, then as a matter of law, Ashley Creek has not been denied access to the Pipeline. Relying on the diskettes provided by the STB, which the STB used to compute the over- and under-collections under the formula used in its October 1996 decision, the SF Defendants have demonstrated that the two tariffs published by SF are reasonable under the STB's methodology. Moreover, they have demonstrated that even if the Chevron tariffs are included in the calculation, the tariffs are reasonable, and, as a matter of law, not a severe handicap.

In its October 1996 decision, the STB held that the tariffs were reasonable if the hypothetical stand-alone pipeline charging the same rates would have collected less than its costs, including recovery of construction costs and its cost of capital. (STB Decision at 39, attached as Attachment D to the SF Defendants' Supporting Memorandum). The STB's methodology provides for recovery of the construction costs on a "level rate per ton in real terms." (*Id.* at 30.) As a result, depreciation cannot be known until the total number of tons shipped is known or assumed and until the "time pattern" of that volume is known or assumed. The volume and the "time pattern" of that volume is thus critical in measuring reasonableness. A heavily disputed issue before the STB was whether there was a market for phosphate concentrate beyond the usage of the Chevron/SF fertilizer plant in Rock Springs.

The STB did not decide that issue, saying that it was for the court to determine whether Ashley Creek was ever in a position to market phosphate, or will be in the future, and to determine the size of the potential market for phosphate that could be delivered by the Pipeline. (*Id.* at 41). The STB did, however, consider two different volume scenarios at the extremes. The first scenario, advocated by the SF Defendants, assumed that the market for phosphate concentrate milled in Vernal was limited to what the Chevron/SF fertilizer plant in Rock Springs could use. Under that scenario, there was no additional market demand and if Ashley Creek ever shipped on the Pipeline, its product would simply replace that otherwise shipped from the Chevron/SF mine. The second scenario, advocated by Ashley Creek, assumed that there was a market beyond the demand of the fertilizer plant in Rock Springs. The STB said that it regarded this second scenarios as "intuitively less compelling." (*Id.*)

The SF Defendants have demonstrated that under the actual Chevron and SF volumes to October 31, 1999, and the most recent projected future volumes of SF, there is a net under-collection of $4,158,000 during the 20–year period 1986–2006 when the revenues collected under all four tariffs are considered. The STB ruled that Chevron should have published a tariff on November 25, 1986, and it therefore used December 1, 1986 as the start date for measuring reasonableness. The earliest Ashley Creek would have been prepared to ship on the Pipeline was three years after publication of a "reasonable rate," or December 31, 1989.

Even assuming Ashley Creek's best case scenario-that Ashley Creek can profitably ship its proposed 1.085 million tons of slurry annually and sell it beyond Rock Springs-and even assuming that it is appropriate to charge the SF Defendants with over-collections during the Chevron period, this best-case scenario still shows an under-collection over the entire 20

years of $436,000, even including both (a) the $16,176,000 over-collection during the Chevron period and (b) the $11,890,000 over-collection during the period Ashley Creek was not shipping. There would have been no over-collection during any year of the SF period and a total under-collection of $90,269,000 during the 17 years Ashley Creek was shipping.[8]

Moreover, before even an "unreasonable" rate can be exclusionary under the essential facilities doctrine, it must result in a "severe handicap" to competition. *City of Chanute v. Williams Natural Gas Co.,* 955 F.2d 641, 652 (10th Cir.1992), *cert. denied,* 506 U.S. 831, 113 S.Ct. 96, 121 L.Ed.2d 57 (1992) *overruled in part on other grounds, Systemcare Inc. v. Wang Lab. Corp.,* 117 F.3d 1137 (10th Cir.1997). Here, because of a net under-collection, there is not even an unreasonable rate, let alone a "severe handicap."

This is particularly true when the only reason the net collections are even close to a net over-collection is because of the significant over-collections during the first three years under the Chevron tariff when Ashley Creek admitted it would not be shipping. That is, during the time only Chevron would have been shipping, the cumulative over-charge was $11,890,000 which Chevron paid to itself. During the period that Ashley Creek would have been shipping, there was no over-charge. In fact, there was an under-collection of $12,326,000.

The SF Defendants point out that Ashley Creek has changed its position by now arguing that the fourth tariff cannot be used to determine if the tariffs are reasonable. Ashley Creek previously argued that updated information should be included in determining whether the tariffs are reasonable. The SF Defendants correctly argue that Ashley Creek cannot have it both ways. Either all four tariffs must be viewed together in the 20–year model, in

which case they result in an under-collection and are reasonable. Or, each tariff must be analyzed for its own reasonableness, an analysis that the STB did not do for any of the three tariffs but which would demonstrate that both the third and the fourth tariffs were reasonable while they were in effect.

Finally, as discussed above regarding standing, Ashley Creek does not know its costs to produce any better than a margin of plus or minus 25%. In 1992, Ashley Creek estimated its costs to be $36.11 per ton with a margin of error ranging from $27.08 to $45.13. Even if the best case scenario showed a net over-collection, such an over-collection can hardly be a severe handicap to entry into the market when the entrant's own costs could vary by 25%. That is, the margin of error in Ashley Creek's cost estimates (plus or minus $9.00 per ton) far exceeds the *entire* tariff Ashley Creek would have been charged by SF Defendants (generally $4.60 under the third tariff and approximately $2.15 during the fourth tariff).

Accordingly, the court finds that the tariffs were reasonable under the STB methodology, and therefore, as matter of law, did not deny Ashley Creek access to the Pipeline. In addition, the court finds that the reasonable tariff was not discriminatory. Thus, there is no antitrust liability on the part of the SF Defendants based on its tariffs.

### III. SHOULD ASHLEY CREEK'S COUNTS X AND XII BE DISMISSED?

In Count XII, Ashley Creek claims that Chevron and the SF Defendants violated their obligations under the FLPMA. Specifically, Ashley Creek asserts that the federal right-of-way permit granted for the pipeline requires SF Pipeline to grant Ashley Creek access on a "non discriminatory and reasonable" basis.

---

8. Ashley Creek has not disputed that using updated volumes and revenues and an Ashley Creek start date of December 1989, there is a net under-collection over the STB's 20–year model, even if the over-collections during the Chevron period are charged to the SF Defendants.

The Tenth Circuit has expressly held that the FLPMA does not provide for a private cause of action. *State of Utah v. Babbitt*, 137 F.3d 1193, 1203 (10th Cir.1998). In addition, the SF Defendants claim that Count X, involving a "federal right of way," is premised on the same FLPMA claim and should be dismissed for the same reasons. They claim that Ashley Creek does not, and cannot, allege that the SF Defendants denied Ashley Creek physical access to the property or that Ashley Creek has been denied access to the Pipeline. Rather, Ashley Creek argues only that the tariff was too high. Ashley Creek cites no authority for the proposition that a common law right of an easement by implication can be converted and extended to a federal right to have the federal courts determine whether a common carrier tariff is too high. Moreover, Ashley Creek does not dispute the SF Defendants' argument that Ashley Creek's claim for a federal easement, which was asserted in 1998, is rendered moot by the 1997 SITLA agreement, which guarantees access at a rate that only covers fixed and variable cost-a rate lower than an owner would need to recover its investment.

For the reasons advanced by the SF Defendants, the court agrees that Counts X and XII of Ashley Creek's Second Amended Complaint should be dismissed.

**IV. SHOULD ASHLEY CREEK'S COUNT XI BASED ON STATE NUISANCE LAWS BE DISMISSED?**

 The SF Defendants argue that Ashley Creek's claim based on state nuisance laws should be dismissed if the federal claims are dismissed. Pendent state law claims should be dismissed if the federal claims are dismissed before trial. *Bauchman v. West High School*, 132 F.3d 542, 549 (10th Cir.1997)("[I]f federal claims are dismissed before trial, leaving only issues of state law, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice") (quotations and citations omitted). This court agrees that Count XI of Ashley Creek's Second Amended Complaint should be dismissed without prejudice.

**CONCLUSION**

For the reasons set forth above, the SF Defendants' Motion for Summary Judgment is **GRANTED** and Counts I–X and XII are **DISMISSED** with prejudice, and Count XI is **DISMISSED** without prejudice. The previous Order in this case, dated June 27, 2000, is **VACATED**.

This Amended Order will be filed under seal for 30 days from the date on which it is entered, at which time it will become unsealed, unless the court enters an Order-upon motion by one or both of the parties-to permanently seal the Amended Order. In addition, all currently pending motions filed by the SF Defendants are hereby denied as moot, unless the SF Defendants notify the court within 10 days from the date the Amended Order is entered that any pending motion need be decided. According to the court's docket, the following motions are still pending:

(1) Motion by SF Defendants for Reconsideration of Order Denying Protective Order (docket # 261);

(2) Motion by SF Defendants for Leave to File Amended Counterclaim (docket # 330);

(3) SF Defendants' Objection to Magistrate Judge's Denial of Motion for Sanctions (docket # 598); and

(4) SF Defendants' Objection to Magistrate Judge's May 2, 2000 Order (docket # 600).

Each party shall bear its own costs.