**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 2 2003**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

ASHLEY CREEK PHOSPHATE
COMPANY,

        Plaintiff-Counter-
        Defendant - Appellant,

and

STATE OF UTAH,

        Plaintiff-Counter-
        Defendant,

v.

CHEVRON USA, INC.; SF PIPELINE
LIMITED COMPANY; SF
PHOSPHATES LIMITED
COMPANY; J.R. SIMPLOT
COMPANY; FARMLAND
INDUSTRIES, INC.; FS, INC., a
Utah corporation; CHEVRON
INDUSTRIES, INC., a Delaware
corporation; CHEVRON CHEMICAL
COMPANY, a Delaware corporation;
CHEVRON PIPE LINE COMPANY, a
Delaware corporation; CHEVRON
CORPORATION, a Delaware
corporation,

        Defendants-Counter-
        Claimants - Appellees.

No. 01-4017

ASHLEY CREEK PHOSPHATE
COMPANY,

        Plaintiff-Counter-
        Defendant,

and

STATE OF UTAH,

        Plaintiff-Counter-
        Defendant - Appellant,

v.                              No. 01-4031

CHEVRON USA, INC.; SF PIPELINE
LIMITED COMPANY; SF
PHOSPHATES LIMITED
COMPANY; J.R. SIMPLOT
COMPANY; FARMLAND
INDUSTRIES, INC.; FS, INC., a Utah
corporation; CHEVRON
INDUSTRIES, INC., a Delaware
corporation; CHEVRON CHEMICAL
COMPANY, a Delaware corporation;
CHEVRON PIPE LINE COMPANY, a
Delaware corporation; CHEVRON
CORPORATION, a Delaware
corporation,

        Defendants-Counter-
        Claimants - Appellees.

ASHLEY CREEK PHOSPHATE
COMPANY,

        Plaintiff-Counter-
        Defendant - Appellant,

and

STATE OF UTAH,

        Plaintiff-Counter-
        Defendant.

v.

CHEVRON USA, INC.; SF PIPELINE
LIMITED COMPANY; SF
PHOSPHATES LIMITED
COMPANY; J.R. SIMPLOT
COMPANY; FARMLAND
INDUSTRIES, INC.; FS, INC., a Utah
corporation; CHEVRON
INDUSTRIES, INC., a Delaware
corporation; CHEVRON CHEMICAL
COMPANY, a Delaware corporation;
CHEVRON PIPE LINE COMPANY, a
Delaware corporation; CHEVRON
CORPORATION, a Delaware
corporation.

        Defendants-Counter-
        Claimants - Appellees.

No. 01-4066

**Appeal from the United States District Court
for the District of Utah
(D.C. Nos. 89-CV-554-K and 96-CV-340-K)**

E. Craig Smay, Salt Lake City, Utah, (Philip Pugsley, Assistant Attorney General, State of Utah, Salt Lake City, Utah, with him on the briefs), for Ashley Creek Phosphate Company and State of Utah, Plaintiffs-Counter-Defendants-Appellants.

Peter W. Billings, Fabian & Clendenin, Salt Lake City, Utah, (Douglas B. Cannon, Fabian & Clendenin, Salt Lake City, Utah; James S. Jardine, Jonathan A. Dibble, and Cameron M. Hancock, of Ray, Quinney & Nebeker, Salt Lake City, Utah, with him on the briefs), for SF Pipeline Limited Company; SF Phosphates Limited Company, J. R. Simplot Company; Farmland Industries, Inc.; and FS, Inc., Defendants-Counter-Claimants-Appellees.

E. Scott Savage, (Stephen R. Waldron, with him on the briefs), Berman, Gaufin, Tomsic & Savage, Salt Lake City, Utah, for Chevron USA, Inc.; Chevron Industries, Inc.; Chevron Chemical Company; Chevron Pipe Line Company; and Chevron Corporation, Defendants-Counter-Claimants-Appellees.

Before **KELLY**, Circuit Judge, **BRORBY**, Senior Circuit Judge, and **MURPHY**, Circuit Judge.

**MURPHY,** Circuit Judge.

## INTRODUCTION

Ashley Creek Phosphate Company ("Ashley Creek") brought suit against Chevron Corporation and several related entities (collectively "Chevron") and J. R. Simplot Company, Farmland Industries, Inc., and three entities owned by, or operated as joint ventures between, Simplot and Farmland (collectively "SF").

Ashley Creek alleged, *inter alia*, that Chevron and SF violated various provisions of the Sherman and Clayton Acts by refusing to set reasonable tariffs for a pipeline utilized to transport phosphate concentrate slurry. The state of Utah brought claims against Chevron identical to and derivative of Ashley Creek's claims. Chevron and SF responded by filing state-law counterclaims against Ashley Creek, asserting that it had filed its complaint and initiated other proceedings in bad faith and without a justifiable basis.

The district court granted summary judgment in favor of Chevron and SF on the antitrust claims, concluding that: (1) Ashley Creek lacked standing to bring its antitrust claims; and (2) in the alternative, the tariffs announced by Chevron and SF for the use of the pipeline were reasonable. Because Utah conceded that its claims were "entirely derivative" of Ashley Creek's claims, the district court dismissed Utah's claims against Chevron on the same bases. The district court dismissed Chevron's and SF's state-law counterclaims without prejudice after disposing of all of the federal claims.

Ashley Creek appeals, contending that the district court erred in granting summary judgment in favor of Chevron and SF on the antitrust claims (No. 01-4017) and in refusing to dismiss Chevron's and SF's state-law counterclaims with prejudice (No. 01-4066). Utah appeals the district court's grant of summary judgment to Chevron (No. 01-4031). This court exercises jurisdiction pursuant to

28 U.S.C. § 1291 and, for the reasons set out below, **affirms** in part, **dismisses** in part, **reverses** in part, and **remands** to the district court for further proceedings consistent with this opinion.

**Appeal Nos. 01-4017, -4031**

## I.  BACKGROUND

The factual and procedural background of this case is lengthy and complex. We set forth only those very limited background facts necessary to put the legal dispute and this court's decision in context.

*A.  Factual/Procedural Background*

In the 1980's, Chevron built an integrated phosphate fertilizer project.  The purpose of the project was to utilize sulfur by-product from Chevron's natural gas operations in Carter Creek, Wyoming.  Rather than attempt to sell the sulfur to existing phosphate fertilizer producers, Chevron chose to produce phosphate fertilizer itself.  Entry into the phosphate fertilizer business was consistent with Chevron's preexisting nitrogen fertilizer business and fertilizer distribution system.

In furtherance of this plan, Chevron purchased an operating phosphate mine located near Vernal, Utah.  Because it was roughly equidistant between Carter Creek and Vernal, and because it was a railhead, Chevron chose to construct its

-6-

fertilizer plant in Rock Springs, Wyoming. Chevron built a pipeline to transport phosphate concentrate slurry from the Vernal mine to the fertilizer plant in Rock Springs. This pipeline runs over lands owned by the United States, including environmentally sensitive lands, pursuant to a right-of-way issued by the Bureau of Land Management ("BLM"). The project became operational with the first shipments of phosphate concentrate through the pipeline sometime after May of 1986.[1]

The state of Utah also owns phosphate deposits in Vernal within a reasonable proximity to the phosphate mine purchased by Chevron. Utah has leased some or all of its phosphate holdings in Vernal to Ashley Creek.[2] When

_____

[1]When Chevron purchased the Vernal phosphate mine it assumed an existing phosphate sales contract with Cominco, Ltd., a phosphate fertilizer producer in western Canada. Prior to the time the pipeline became operational, Chevron supplied Cominco by trucking phosphate to a railhead near Park City, Utah. In 1988, Cominco cancelled its phosphate contract with Chevron, concluding that it could obtain all the phosphate it needed at a lower cost from its own mining operations. Neither Chevron nor its successor-in-interest, SF, ever sold phosphate concentrate to a third-party after 1988, despite repeatedly trying to find outsider purchasers. During the entire time Chevron owned and operated the pipeline, no additional phosphate mines were developed in the United States and, after 1988, there were no third-party phosphate sales from a western United States phosphate mine. In 1992, Chevron completely exited the business by selling its interest in the entire integrated fertilizer project to SF for $64 million, only half of what it paid for the Vernal mine alone.

[2]As set out more fully below, Ashley Creek has no employees, no credit history, and no assets other than these undeveloped phosphate leases. John Archer, Ashley Creek's sole shareholder, pays, on behalf of Ashley Creek, $11,000 per year for the leases.

Ashley Creek learned that Chevron intended to construct a pipeline to transport phosphate from Vernal to Rock Springs, it approached Chevron about the possibility of constructing the pipeline as a joint venture. In fact, Ashley Creek requested that the BLM condition the granting of any right-of-way "upon requirements that operators of nearby properties which may be benefitted by a pipeline be given reasonable opportunity to participate in the line upon payment of an appropriate share of expenses." The BLM denied this request on the grounds that it understood the proposed pipeline would be subject to the jurisdiction of the Interstate Commerce Commission ("ICC") and that Ashley Creek would be able to ship its phosphate through the pipeline under tariffs set by the ICC.

In November of 1986, Ashley Creek approached Chevron requesting rate information for the shipment of phosphate slurry through the pipeline. Although Chevron provided Ashley Creek with preliminary rate estimates, it refused to publish a tariff. In response, Ashley Creek filed a complaint with the ICC alleging that Chevron was a common carrier by pipeline unlawfully operating without a tariff. In a decision issued in 1989, the ICC determined that Chevron was a common carrier and ordered it to establish rates and file a tariff for the transportation of phosphate slurry through the pipeline. *Ashley Creek Phosphate Co. v. Chevron Pipe Line Co.*, 5 I.C.C.2d 303 (1989).

In response to the order, Chevron published a tariff. On June 19, 1989, the day before the tariff became effective, Ashley Creek and Utah filed suit against Chevron, asserting that Chevron's actions with regard to the pipeline violated the antitrust laws of the United States. Shortly thereafter, the ICC, Ashley Creek, Utah, and Chevron all agreed and stipulated as follows: "[t]he determination of whether the rates which [Chevron has] established in its tariff for transporting phosphate through the Chevron slurry pipeline from Vernal, Utah, to Rock Springs, Wyoming, are unjust, discriminatory or unreasonable, is hereby referred to the [ICC]." The district court stayed resolution of Ashley Creek's and Utah's antitrust claims against Chevron pending the resolution of the issues referred to the ICC.

For the next seven years, the reasonableness of the published tariffs on the phosphate pipeline was litigated before the ICC and its successor agency, the Surface Transportation Board ("STB").[3] While the matter was pending before the ICC, Chevron published a revised tariff in August of 1991 and a second revised tariff in February of 1992. Each revised tariff reduced the rates of the prior tariff. In April of 1992, Chevron sold its entire integrated phosphate fertilizer project to SF. SF immediately adopted the Chevron tariff then in effect. In response to this

_____

[3]The ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803 (1995), abolished the ICC and transferred certain functions and pre-existing proceedings to the STB effective January 1, 1996.

transaction, Ashley Creek filed a complaint with the ICC naming SF as a defendant and repeating the allegations regarding the pipeline set out in its original ICC filing. The ICC consolidated the two complaints and indicated that it would apply the identical ratemaking methodology in both cases.

In October of 1996, the STB issued a decision on Ashley Creek's consolidated administrative complaints (the "1996 Order"). *Ashley Creek Phosphate Co. v. Chevron Pipe Line Co.*, Nos. 40131, 40810, 1996 WL 625471 (S.T.B. 1996). The STB found that the published tariffs were "unreasonable for shipments at many volume levels." *Id.* at *19. It nevertheless concluded that "there may be certain shipping patterns where the tariff rate structure would be reasonable," and ultimately summarized its decision as follows:

> On the record developed in this proceeding, we are unable to determine the size of the phosphate market, nor can we evaluate whether Ashley Creek[] has the ability to serve that market. Rather, it is for the court in the underlying antitrust action to determine whether Ashley Creek was ever in a position to market phosphate, or will be in the future, and to determine the size of the potential market for phosphate that could be delivered by this pipeline. It may be that the court will conclude that one of our other volume usage scenarios[4]—or, indeed, a scenario that we did not even consider at all—is more useful for purposes of the antitrust litigation. Our role is simply to assist the court by presenting a framework for addressing the narrow issue that is the subject to our primary jurisdiction.
> We find:

---

[4]Appended to the 1996 Order were several tables evaluating the reasonableness of the tariffs at different volumes of phosphate shipped through the pipeline.

> Defendants' subject tariffs covering the transportation of phosphate slurry from Vernal, UT, to Rock Springs, WY, are unreasonable to the extent discussed in this decision.

*Id.* (footnote omitted).[5]

After the STB issued the 1996 Order, the district court granted Ashley Creek permission to file an amended complaint alleging antitrust claims against SF. The district court further indicated that the stay it had previously entered pending the STB's resolution had expired as a result of the issuance of the 1996 Order. Utah declined to join Ashley Creek's amended complaint to the extent it stated claims against SF; instead, SF and Utah entered into an agreement whereby SF guaranteed that the tariff then in effect would not be raised.[6]

---

[5]The parties vigorously contested before the district court, and continue to contest on appeal, whether the 1996 Order definitively concluded that the published tariffs were unreasonable or, instead, merely provided a framework for analyzing the reasonableness of the tariffs for the district court to apply. The district court concluded that the 1996 Order merely set out an analytical framework to be applied by it and that the necessary analysis "hinge[d] on the resolution of substantial factual questions." Utilizing a new tariff published by SF in 1999, along with the three previously published tariffs utilized by the STB in conducting its analysis, the district court ultimately concluded that the tariffs were reasonable. In light of this court's affirmance *infra* of the district court's conclusion that Ashley Creek lacks standing to bring its antitrust claims, we need not address the propriety of the district court's alternative ruling that the published tariffs were reasonable.

[6]In 1999, SF published a new tariff, the fourth tariff to be published since 1989. The fourth tariff recovers only operating and new capital costs, not original capital costs. Although this fourth tariff played a key role in the district court's decision that the published tariffs on the pipeline were reasonable, this court need not reach the issue.

-11-

*B. District Court Order*

After the STB issued its 1996 Order and the district court indicated that its previously imposed stay had expired, SF filed a motion for summary judgment. In its motion, SF asserted that it was entitled to summary judgment on two independent bases: (1) Ashley Creek failed to demonstrate that it had standing to bring its antitrust claims; and (2) its tariff for the use of the pipeline was not exclusionary. The district court granted the motion, ruling in favor of SF on each of the independent bases advanced in its motion.

The district court began by noting that to have standing to bring antitrust claims, Ashley Creek must demonstrate: (1) it has an antitrust injury to either its business or its property; and (2) there is a direct causal connection between that injury and the alleged violation of antitrust laws. *See Sports Racing Serv. Inc. v. Sports Car Club of Am., Inc.*, 131 F.3d 874, 882 (10th Cir. 1997). Ashley Creek asserted both injury to its business (exclusionary tariffs prevented it from entering the phosphate concentrate and phosphate fertilizer industries) and injury to its property (those same exclusionary tariffs impaired the value of its mineral leases). Nevertheless, because Ashley Creek had never been in the business of selling phosphate concentrate or producing and selling phosphate fertilizer, the district court concluded that Ashley Creek could not demonstrate an "antitrust injury" to its business unless it could demonstrate that it "manifested an intention to enter"

the market **and** "a preparedness to do so." *Curtis v. Campbell-Taggart, Inc.*, 687 F.2d 336, 338 (10th Cir. 1982). With these standards in mind, the district court concluded that Ashley Creek failed to demonstrate either an antitrust injury or a causal nexus between the alleged antitrust injury and the alleged antitrust violation.

As to the antitrust-injury prong of the standing requirement, the district court assumed, without deciding, that Ashley Creek manifested an intention to enter the relevant markets; it concluded, however, that Ashley Creek failed to demonstrate preparedness to enter the market. In summary, the district court determined that: (1) Ashley Creek had failed to determine whether there is a market for phosphate and the price Ashley Creek would have to charge to cover its costs if the pipeline tariff were zero; (2) Ashley Creek had not even come close to taking the affirmative steps necessary to obtain financing of a capital intensive venture; and (3) Ashley Creek did not have any background or experience in mining, milling, or selling phosphate or phosphate fertilizer. The district court specifically rejected Ashley Creek's claim that SF's allegedly excessive tariffs excused it from taking steps to enter the market. The district court noted that there were numerous steps necessary for market entry that were completely unrelated to the cost of shipping phosphate from Vernal to Rock Springs. For these exact same reasons, the district court also concluded that

-13-

Ashley Creek had failed to satisfy the causal-nexus prong of the standing requirement.

The district court likewise rejected Ashley Creek's claim that it had standing solely by virtue of its mineral leases. The district court noted that the mineral leases, for which Ashley Creek pays the state of Utah approximately $11,000 per year, were only a minor component in the development of a heavily capital-intensive industry. Because Ashley Creek had failed to establish its viability in the relevant markets, the district court concluded that it would be mere speculation to recognize the leasehold interest as being injured. In that regard, the district court noted that mineral leases only hold value if the minerals can be economically mined, milled, and sold; without showing that its leases could be developed economically, the district court concluded that Ashley Creek could only speculate on their value.

Although the district court concluded that Ashley Creek did not have standing to bring its antitrust claims, it nevertheless went on the analyze whether SF's tariffs were sufficiently unreasonable to be exclusionary under the essential facilities doctrine. *See generally City of Chanute v. Williams Natural Gas Co.*, 955 F.2d 641, 647-49 (10th Cir. 1992) (discussing essential facilities doctrine). Utilizing the framework set forth in the 1996 Order, the district court concluded that SF's tariffs were not unreasonable, when considered together and over the

twenty-year life of the pipeline, because the tariffs actually resulted in a significant under-collection with regard to return on capital.

In light of the district court's grant of summary judgment to SF, Chevron filed a summary judgment motion contending that it was entitled to summary judgment on the same grounds. Ashley Creek did not contest that the district court's resolution of SF's summary judgment motion would also necessitate dismissal of its claims against Chevron. Instead, Ashley Creek argued that the district court's order granting summary judgment to SF was wrongly decided. The district court therefore treated Ashley Creek's memorandum in opposition to Chevron's summary judgment motion as a motion for reconsideration. So construed, the district court denied the motion on the grounds that it was not supported by previously unavailable evidence or an intervening change in controlling law. *See* Fed. R. Civ. P. 59(e). The district court then granted Chevron summary judgment for the same reasons previously articulated in granting SF summary judgment.

## II. DISCUSSION

*A. Standard of Review*

This court reviews a grant of summary judgment *de novo*, applying the same standard used by the district court under Fed. R. Civ. P. 56(c). *Sports Racing*, 131 F.3d at 882. Summary judgment "shall be rendered forthwith if the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Although this court has noted that in the broad sense summary judgment should be used sparingly in antitrust cases, "the usual rules governing summary judgment still apply." *Sports Racing*, 131 F.3d at 882; *see also Curtis*, 687 F.2d at 338 ("Summary procedures are to be used sparingly in anti-trust litigation. But where . . . the record clearly indicates that there are no circumstances under which plaintiff can prevail, summary procedures are appropriate to avoid needless trials and unnecessary expense."). "Moreover, even in antitrust cases, we are not limited to the grounds upon which the trial court relied but may base summary judgment on any proper grounds found in the record to permit conclusions of law." *Sports Racing*, 131 F.3d at 882 (quotation and alteration omitted). The district court's ruling that Ashley Creek lacked standing under Section 4 of the Clayton Act, 15 U.S.C. § 15, is a question of law subject to *de novo* review. *Id.*

### B. Analysis

Section 4 of the Clayton Act confers on private parties the power to enforce federal antitrust laws. *See* 15 U.S.C. § 15(a) ("[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws

may sue therefor [in the appropriate federal district court].”); *see also id.* § 12(a) (defining “antitrust laws”).  Although Section 4 appears to be a broad grant of standing, “a plaintiff’s right to sue for money damages is subject to a number of limitations unique to the antitrust laws that are based upon the express words of the statute and policies found by courts to be implicit in the structure and purpose of the antitrust laws.”  ABA Section of Antitrust Law, *Antitrust law Developments* 839 (5th ed. 2002); *see also id.* 839 n.29 (collecting cases); *Reazin v. Blue Cross & Blue Shield of Kan.*, 899 F.2d 951, 962 n.16 (10th Cir. 1990) (“We are also aware that the Supreme Court may be concerned about reading section 4 of the Clayton Act too broadly.”).  “To maintain standing to bring an antitrust claim under § 4 of the Clayton Act, 15 U.S.C. § 15, a plaintiff must show (1) an ‘antitrust injury’; and (2) a direct causal connection between that injury and a defendant’s violation of the antitrust laws.”  *Sports Racing*, 131 F.3d at 882.

> To meet the first prong [a plaintiff] must allege a business or property injury, an antitrust injury, as defined by the Sherman Act. An antitrust injury is defined as an injury of the type the antitrust laws were intended to prevent and that flows from that which makes [the defendant’s] acts unlawful.  A violation of the Act without resultant injury to the [plaintiff] is insufficient to confer standing, [plaintiff] must show the antitrust injury resulted directly from [the defendant’s] violation of antitrust law.

*City of Chanute*, 955 F.2d at 652 (citations and quotations omitted).

Ashley Creek claims that Chevron’s and SF’s allegedly exclusionary tariffs for the use of the phosphate slurry pipeline caused an antitrust injury to both

Ashley Creek's business and property. An antitrust injury to *either* Ashley

Creek's business *or* property would be sufficient to confer standing on Ashley

Creek to raise the instant antitrust claims. *See* 15 U.S.C. § 15(a).

### *1. Injury to Business*

Ashley Creek is not, and has never been, in the business of mining and

selling phosphate concentrate.[7] "However, most courts have not required a

plaintiff to actually be engaged in an ongoing business in order to have standing

under the anti-trust laws. It is sufficient if he has manifested an intention to enter

the business and has demonstrated his preparedness to do so." *Curtis*, 687 F.2d at

338 (quotation omitted); *see also* ABA Section of Antitrust Law, *Antitrust law

Developments* 842 & n.38 (5th ed. 2002) (collecting cases for following

proposition: "[M]ost courts have held that injury to an enterprise in the planning

stage is actionable, provided that the plaintiff has an intent and capability to enter

the market and has achieved a sufficiently advanced state of preparation for doing

so."). This court has identified the following as "key elements" in evaluating the

plaintiff's preparedness to enter a business: (1) ability to finance the business and

---

[7]To the extent that Ashley Creek's appellate filings could be read to hint at an antitrust claim relating to its potential entry into the phosphate fertilizer market, we agree with the district court that there is absolutely no evidence in the record that Ashley Creek was ever prepared to enter that market. Accordingly, this court, like the district court, restricts its analysis to Ashley Creek's claims regarding the phosphate concentrate market.

purchase the necessary facilities and equipment; (2) consummation of contracts needed for the proposed venture; (3) affirmative actions by the plaintiff to engage in the proposed business; and (4) the background and experience of the plaintiff in the prospective business. *Curtis*, 687 F.2d at 338. In examining preparedness, courts have uniformly

> drawn the line at the point where promotion transcends the level of hopes, desires, and expectations, and reaches a certain stage of maturity and concreteness, a stage where it is accompanied by certain indicia of ultimate success. Put another way, the courts have held that a potential competitor cannot achieve standing merely by demonstrating his *intention* to enter a field; he must also demonstrate his *preparedness* to do so.

*Hect v. Pro-Football, Inc.*, 570 F.2d 982, 994 (D.C. Cir. 1977) (cited with approval in *Curtis*, 687 F.2d at 338).

In analyzing whether Ashley Creek could demonstrate standing under the standards set out by this court in *Curtis*, the district court began by assuming, without deciding, that Ashley Creek had manifested its intention to enter the phosphate concentrate market. The district court concluded, however, that Ashley Creek could not satisfy any of the key elements identified in *Curtis* for measuring preparedness to enter the phosphate concentrate market. In that regard, the district court noted that Ashley Creek's own estimates placed the cost of entering the phosphate concentrate market at something in excess of $67 million during the relevant time frame. The record revealed, however, that Ashley Creek had only a

thousand dollars on hand and had done nothing to obtain financing. The record further revealed that Ashley Creek had completed only a limited "Type 1" feasability study, and that a "Type 3" or "Type 4" study would be necessary to secure financing. In addition, the district court noted that Archer, Ashley Creek's sole shareholder, testified that to obtain financing Ashley Creek would need signed contracts with customers to purchase phosphate concentrate at a specified price. The record revealed, however, that Ashley Creek had never discussed price with any potential customer. The district court noted that this was most likely because Ashley Creek's very preliminary feasibility study left it unable to project its own costs of production at anything less than a margin or error of plus or minus 25%. In fact, Ashley Creek did not know whether there were any customers who would buy concentrate at the price Ashley Creek would have to charge even if the tariff was zero. Finally, the district court noted that although Archer, the only then-current officer of Ashley Creek, did have experience in buying and selling phosphate reserves, he did not have any experience in mining and selling phosphate concentrate.

The district court likewise rejected Ashley Creek's assertion that it was not required to demonstrate any further preparatory steps to enter the phosphate concentrate market because the actions of Chevron and SF had rendered such steps futile. Although noting that not all courts had adopted such a futility

exception and that this court had yet to decide the question, the district court nevertheless concluded that Ashley Creek failed to fall within the ambit of the rule. The district court pointed out that Ashley Creek's assertion that it could not conduct relevant feasability studies because Chevron had refused to publish a tariff was not borne out by the record. In particular, at no time after Chevron published a tariff in 1989 did Ashley Creek take steps to determine whether it was economically feasible to sell phosphate under the 1989 tariff or any of the successively lower tariffs. This was true even after the State of Utah and SF entered into a settlement agreement guaranteeing that the tariff would not be raised and after SF published the fourth tariff which recovers only operating and new capital costs and no original capital costs. More importantly, the district court noted that even assuming some or all of the first three tariffs were too high, Ashley Creek was not prevented from determining: (1) what price customers were willing to pay for phosphate concentrate, assuming there was actually a market for phosphate concentrate; (2) the freight cost to ship phosphate concentrate from the railhead in Rock Springs; or (3) its own production costs with sufficient precision to know the significance of a few dollars difference in the tariff. These factors, coupled with Archer's deposition testimony that Ashley Creek would not move forward with its project, regardless of the amount of the applicable tariff,

without owning a 40% share of the pipeline, led the district court to conclude that a futility exception did not apply.

Although its brief before this court is less than clear, Ashley Creek appears to challenge both the district court's ruling that it lacked standing because it failed to demonstrate preparedness to enter the phosphate concentrate market and the district court's ruling that its lack of preparation is not excused by some futility exception to the preparedness doctrine. Neither of Ashley Creek's arguments are convincing.

This court can easily dispose of Ashley Creek's assertion that it was, in fact, prepared to enter the market during the relevant time frame.[8] Ashley Creek sets out the following list of eleven steps that it took prior to the point Chevron refused to publish a tariff: (1) obtained the mineral leases; (2) hired a mining engineer to explore the leaseholds and test the ore and provide a preliminary assessment on the economic feasability of producing phosphate concentrate; (3)

---

[8]We note with some frustration that Ashley Creek completely fails to distinguish between the actions of Chevron and SF in asserting that it was prepared to enter the market for phosphate concentrate. Whether Ashley Creek was prepared to enter the market during the time Chevron controlled the pipeline is a distinct question from whether Ashley Creek was prepared to enter the market when SF was in control of the pipeline. Likewise, whether the actions of Chevron or SF rendered such preparation futile presents different questions. Ashley Creek never distinguished between the actions of Chevron and SF before the district court and does not do so on appeal. Nevertheless, our review of the entire appellate record leads this court to conclude that Ashley Creek was never prepared to enter the market during the entire time frame at issue.

obtained the promise of common carriage in the pipeline; (4) obtained a contract for necessary water[9]; (5) filed a mine plan and commenced acquisition of necessary permits; (6) commenced acquisition of an appropriate plot of land at Rock Springs[10]; (7) preliminarily designed a mining operation[11]; (8) performed a preliminary feasibility study; (9) commenced initial negotiations with potential customers[12]; (10) commenced inquiries regarding financing[13]; (11) formed a

---

[9]Although Ashley Creek asserts in its brief that it "obtained a contract" for water, it does not appear that such a contract was ever executed. Instead, the record demonstrates only that it engaged in negotiations with the Uintah Water Conservancy District and the Department of Interior regarding water supplies.

[10]In support of this assertion, Ashley Creek cites to page 669 of SF's appendix. This citation is to the text of Ashley Creek's own memorandum in opposition to SF's motion for summary judgment. That memorandum does assert that Ashley Creek began negotiations with the BLM to acquire an appropriate parcel of land in Rock Springs for drying and loading facilities. Nevertheless, the cited exhibits attached to the memorandum do not support the proposition. Instead, the referenced exhibits relate exclusively to negotiations between Ashley Creek, the Department of Interior, and the Uintah Water Conservancy District regarding water supplies for a potential mining project. Accordingly, Ashley Creek has not directed this court to any record support for the assertion. We further note that Ashley Creek's consistent practice of citing to its own factual assertions in its various legal memoranda filed below, rather than citing to the relevant portions of the record supporting a given factual assertion has seriously delayed the resolution of this appeal.

[11]It is far from clear how this supposed preparatory step is different from the fifth preparatory step identified by Ashley Creek as both are supported by the same ultimate citation to a Notice of Intention to Commence Mining Operations and Mining and Reclamation Plan, Form MR-1.

[12]In support of this assertion, Ashley Creek cites to three separate pages of its memorandum in opposition to SF's motion for summary judgment. Although the memorandum does use the term "customers," only one customer, Cominco, is

-23-

corporation to carry on the business. These very preliminary steps are insufficient to show preparedness to enter the market.

First, as noted by the district court, Ashley Creek had no financing commitment and was in no position to obtain financing. In particular, Ashley Creek has not cited to a single piece of record evidence indicating that it made even a preliminary inquiry regarding financing of a mining and milling operation, an operation which Ashley Creek itself estimated to cost in excess of $67 million. Even if it had made such contacts, Ashley Creek does not contest the district

identified and supported by a citation to record evidence.

[13]In support of this assertion, Ashley Creek cites to page 669 of SF's appendix, again a citation to Ashley Creek's memorandum in opposition to SF's motion for summary judgment rather than a citation to record evidence. The only relevant material on the referenced page is the following paragraph:

> Discussions with potential customers and regarding financing were necessarily preliminary and inconclusive. While a number of correspondents indicated interest if the pipeline were constructed and available at economic rates, in the absence of a reliable statement of pipeline transport costs, no estimate of Ashley Creek's potential price for phosphate concentrate FOB Rock Springs could be given potential customers allowing discussions to go further. Absent clear expressions of interest from potential customers, discussions of financing could not progress.

The assertions in Ashley Creek's memorandum regarding commencing inquiries as to financing are not supported by a citation to record evidence. Accordingly, Ashley Creek has once again directed this court to a portion of the voluminous record that does not support its factual assertions. Counsel is reminded that this court "will not search the record in an effort to determine whether there exists dormant evidence which might require submission of the case to a jury." *Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1546 (10th Cir. 1995). Accordingly, Ashley Creek has provided no record support for the assertion that it made initial inquiries regarding financing.

court's conclusion that the "Type 1" feasability study conducted by Ashley Creek was completely insufficient for such purposes. Nor had Ashley Creek consummated any of the contracts necessary to operate a phosphate mine. The record citations provided by Ashley Creek on appeal show only that it engaged in negotiations regarding water supplies to the proposed mine and that it discussed sales of phosphate concentrate with Cominco without ever discussing a price. Furthermore, although Ashley Creek notes that it commenced the application process for a mining permit, that is only one of the many permits necessary to develop and operate the mine, it points to no record evidence that it ever obtained the necessary permits. In fact, the record demonstrates that when Ashley Creek filed its mining plan and applied for a mining permit in March of 1986, the application was rejected on multiple grounds. Finally, it is clear that Ashley Creek did not have the necessary experience and background in the business of selling phosphate concentrate. Ashley Creek has never had any paid employees. Archer, the sole shareholder, pays all of Ashley Creeks bills and runs the corporation out of his house. Although Archer has been in the business of acquiring and selling mineral properties and reserves, neither he nor Ashley Creek has ever developed or operated a mine. For these reasons, we agree with the district court that Ashley Creek was not prepared to enter the market at the point when Chevron refused to publish a tariff. Furthermore, as set out at length in the

district court's opinion, *Ashley Creek Phosphate Co. v. Chevron*, 129 F. Supp. 2d 1299, 1304-05 (D. Utah 2000), Ashley Creek did not take any further, meaningful preparatory steps at any point after Chevron and SF filed a series of successively lower tariffs. Accordingly, the district court correctly concluded that Ashley Creek lacked standing under Section 4 of the Clayton Act for its injury to business claim, having failed to demonstrate that it was prepared to enter the market.

This court also agrees with the district court that Ashley Creek's lack of preparation is not excused by a futility exception to the preparation requirement. As Ashley Creek quite correctly notes, several courts have recognized that in order to show preparation to enter a given market, an antitrust plaintiff need not take those steps which would have been rendered futile by an alleged monopolist. *See, e.g.*, *Thompson v. Metro. Multi-List, Inc.*, 934 F.2d 1566, 1572 (11th Cir. 1991) ("[A] defendant cannot benefit by the application of the standing doctrine from the fact that it is able to prevent the plaintiff from becoming a [competitor]."); *Fleer Corp. v. Topps Chewing Gum, Inc.*, 415 F. Supp. 176, 180 (E.D. Pa. 1976) ("It would be inconsistent with one purpose of the Clayton Act—to protect the business interests of the victims of monopolistic practices—to require an antitrust plaintiff to pay a courtroom entrance fee in the form of an expenditure of substantial resources in a clearly futile competitive gesture.").

Although this court has not yet addressed the issue, we have no doubt that there exists some type of futility exception to the preparation requirement set out in *Curtis*. Whatever the parameters of such an exception, however, it clearly does not excuse Ashley Creek from performing the most basic preparatory steps to determine whether: (1) there was a market for phosphate concentrate and, if so, what price customers were willing to pay; (2) the exact nature of its reserves; and (3) its own costs of production and delivery within a reasonable margin, including shipping costs from the railhead in Rock Springs, in order to determine whether it could profitably sell concentrate even if the tariff were set at zero. Without undertaking the basic preparatory steps to answer these questions, Ashley Creek has absolutely no basis for showing that its "business" was in any way damaged by the allegedly exclusionary tariffs or other factors. *See Ashley Creek*, 129 F. Supp. 2d at 1305 (quoting following from 1993 statements of David Aro, Ashley Creek's consulting mining engineer: "I have felt for some time that the level of *legal effort* far exceeds the level of *technical data* that is essential to verifying the reserves and costs. Without 'proven' reserves and 'acceptable' costs, the legal arguments could be 'hypothetical and meaningless.'").

Ashley Creek's futility argument boils down to an assertion that a proposed market participant need take no further preparatory steps, even of the most basic and preliminary nature, after an asserted violation of the antitrust laws by the

party in control of an essential facility. Such an approach would eviscerate the standing requirement, rendering it wholly dependent on the merits of the plaintiffs case. *See Gas Utils. Co. of Ala., Inc. v. S. Natural Gas Co.*, 825 F. Supp. 1551, 1573 (N.D. Ala. 1992) (holding that plaintiff could not use defendant's denial of access to a pipeline to create an inference of antitrust injury to business or property). Allowing an antitrust plaintiff to recover merely upon a showing of a violation of the act, without a demonstration of injury-in-fact, would conflict with this court's precedent. *See City of Chanute*, 955 F.2d at 652 ("A violation of the Act without resultant injury to the [plaintiff] is insufficient to confer standing." (quotation omitted)). Furthermore, none of the cases cited by Ashley Creek support its assertion that this court should adopt such an expansive reading of the futility doctrine. In the very cases cited by Ashley Creek, the courts applied the four-factor preparedness test and analyzed whether the plaintiff had presented adequate evidence of concrete preparedness. *See, e.g.*, *Thompson*, 934 F.2d at 1572 (applying preparedness requirement and finding standing when plaintiff was already an established realtor in the market served by the defendant board of realtors and multiple listing service); *Jayco Sys. v. Savin Bus. Mach. Corp*, 777 F.2d 306, 314 (applying four-part test and finding standing only for injury to plaintiff's normal course of business, not to its proposed business expansion); *Hecht*, 570 F.2d at 994 (applying four-part test and noting that plaintiff's

preparation must be at "a stage where it is accompanied by certain indicia of ultimate success").

For these reasons, in addition to those separate reasons set out by the district court,[14] we conclude that Ashley Creek's almost complete failure to prepare to enter the phosphate concentrate market is not excused by the futility doctrine.

### 2. Injury to Property

Ashley Creek also claims standing flowing from injury to its property, i.e., the mineral leases. It is uncontested that Ashley Creek's mineral leases constitute "property" for purposes of Section 4 of the Clayton Act. In rejecting Ashley Creek's assertion that it had standing to raise its antitrust claims solely by virtue of its mineral leases, the district court concluded as follows:

> The mineral leases (for which Archer or Ashley Creek now pays a little over $11,000 per year) is only one minor component in the development of a project that Ashley Creek admits would have cost $67 million in capital in 1990. Because Ashley Creek has not established the necessary steps to show its viability in that market, it would be too speculative and remote to recognize the leasehold interest as being injured. The mineral leases only hold value if the minerals can be economically mined, milled, and sold. Without showing that its leases could be developed economically, Ashley Creek can only speculate on the leases' value.

---

[14]*Ashley Creek*, 129 F. Supp. 2d at 1305-06; *see also supra* pp. 18-19 (discussing district court's analysis of Ashley Creek's futility claim).

*Ashley Creek*, 129 F. Supp. 2d at 1307. On appeal, Ashley Creek asserts that the district court erred in applying the preparation rule from *Curtis* to its claim of injury to property. Instead, Ashley Creek posits that its "leases represent a value protected by Section 4 of the Clayton Action without more." Appellant's Br. at 25. In support of this assertion, Ashley Creek relies on a 1964 district court decision in *Waldron v. British Petrol. Co.*, 231 F. Supp. 72 (S.D.N.Y. 1964).

We reject Ashley Creek's assertion that possession of property alone confers standing. The language of the Clayton Act makes clear that it is the injury to property, rather than its mere possession, that confers standing. *See* 15 U.S.C. § 15(a) ([A]ny person who shall be injured in his . . . property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States . . . ."). In this case, there is no evidence that Chevron or SF clouded Ashley Creek's title to the leases. Nor is there any evidence that the leases were less valuable after the supposedly anti-competitive acts than they were before those acts.[15] In fact, there is not a single citation to the record in that

---

[15]The history of these particular mineral leases reveal multiple failed attempts to develop the phosphate deposits. Archer first acquired the leases from Utah in 1963; he immediately sold the leases to Mountain Fuel Supply Company. Mountain Fuel failed to develop a mine and, instead, allowed the leases to lapse. Archer reacquired the leases in 1974 and assigned them to Utah International in 1975. Utah International also failed to develop a mine, after determining that development was not feasible at then-current and projected phosphate prices. After the leases were re-assigned to Archer in 1984, he attempted to sell them to Chevron and Cominco. Both companies indicated that they were not interested.

section of Ashley Creek's brief relating to its claim of injury to property. In reality, Ashley Creek's claimed injury relates to a proposed business—a phosphate concentrate supply business that would have used the mineral leases. To have standing to allege injury to an inchoate business interest, Ashley Creek must establish its preparedness to enter the market. As set out at length above, however, Ashley Creek has utterly failed to demonstrate that it was prepared to develop the mineral leases. In these narrow circumstances,[16] this court concludes that the district court properly considered Ashley Creek's lack of preparedness to enter the phosphate concentrate market in analyzing whether Ashley Creek had demonstrated an injury to its mineral leases.

The district court opinion in *Waldron* is not to the contrary. In *Waldron*, the plaintiff had a "highly desired contract" with the Iranian Oil Company to purchase oil. 231 F. Supp. at 78. The plaintiff alleged a conspiracy among the defendant major oil companies to refuse to purchase either oil or the contract from the plaintiff. *See id.* at 79-81, 86-87. The court held that although the plaintiff could not claim standing based on injury to his business because he was

In 1997, Archer approached Agrium about its interest in investing in the leases. Agrium declined the invitation. Accordingly, the record reveals that every company Ashley Creek approached has failed or declined to develop the leases.

[16]That is, when the plaintiff's claimed injury to property flows from its claim that it would have used the property as part of an anticipated business venture.

-31-

not prepared to enter the business of selling oil, he did have standing based on injury to his property in the form of the contract itself. *See id.* at 86-87. Unlike the plaintiff in *Waldron*, however, Ashley Creek never tried to sell its leases to Chevron or SF during the relevant time period. Instead, the record reveals that Archer testified that the leases were not for sale. Furthermore, in *Waldron*, there was a material dispute of fact as to whether the contract *qua* contract had any value. *See id.* at 87. In contrast, the record in this case is completely devoid of evidence relating to the value of the leases during the relevant time periods. Accordingly, Ashley Creek has simply not put forward even a scintilla of evidence to demonstrate that it suffered any harm to its property at the hands of Chevron and SF.

## III. Conclusion

For those reasons set out above, this court concludes that Ashley Creek has failed to adduce evidence from which a trier of fact could conclude that it has suffered an antitrust injury to either its business or property. We therefore **affirm** the district court's dismissal of Ashley Creek's antitrust claims for lack of standing. Our conclusion that Ashley Creek lacks standing to assert its antitrust claims obviates the need to address the district court's alternative conclusion that tariffs charged by Chevron and SF were reasonable. This court offers no opinion on that question.

## I. Background

In response to Ashley Creek's underlying complaint, Chevron filed a state-law counterclaim alleging that Ashley Creek had brought the action in bad faith and without a justifiable basis. In support of its claim, Chevron asserted as follows: (1) Ashley Creek had falsely stated that Chevron's published tariff was unreasonable and that it was entitled to a preferential tariff; (2) Ashley Creek was wrongfully attempting to force Chevron to sell it an interest in the pipeline; and (3) Ashley Creek had involved Chevron in extensive and costly litigation before state and federal agencies and state court. Ashley Creek moved the district court to dismiss the counterclaim. It first asserted that under Utah state law, claims for malicious prosecution, such as the claims asserted by Chevron, cannot be filed until the lawsuit which forms the basis of that claim has been concluded. In the alternative, assuming Chevron could maintain its claim as a counterclaim, Ashley Creek asserted that the claim failed as a matter of law for the following reasons: (1) the STB had concluded Chevron's published tariff was unreasonable; and (2) Ashley Creek could not have a bad faith ulterior motive of forcing Chevron to sell it an interest in the pipeline because Chevron had previously sold its entire interest in the pipeline.

The district court, Judge David Sam presiding, denied the motion to dismiss. Judge Sam first concluded that under Utah law, a claim for abuse of process may be asserted by way of counterclaim. He further concluded that, viewed through the lens of the motion to dismiss standard, Chevron's counterclaim alleged the necessary elements of an abuse of process claim. Judge Sam noted that under Utah law the essential element of an abuse of process claim was the use of judicial proceedings for an ulterior purpose for which they were not intended. *See Crease v. Pleasant Grove City*, 519 P.2d 888, 890 (Utah 1974). In concluding that Chevron's counterclaim stated this basic element, Judge Sam indicated as follows:

> In its counterclaim Chevron alleges that [Ashley Creek] has brought the underlying action in bad faith and without justifiable basis; that [Ashley Creek's] real motive in filing the litigation is to improperly force defendants to sell plaintiff an interest in the pipeline; and that [Ashley Creek] has involved Chevron in state and federal proceedings seeking to invalidate easements over public land for the pipeline and to increase the expense and burden of litigation.

After SF was joined as a third-party defendant, it also brought a bad faith litigation counterclaim against Ashley Creek. Ashley Creek moved to dismiss the SF counterclaim on the following grounds: (1) SF's counterclaim did not allege that Ashley Creek was pursuing the litigation for the improper ulterior motive of forcing divestiture of the pipeline and, in any event, forced divestiture was an available and appropriate remedy in antitrust cases involving an essential facility;

-34-

(2) SF's assertion that Ashley Creek was only seeking a preferential tariff was demonstrably false in light of the STB's decision that the published tariff was unreasonable; and (3) no abuse of process claim could lie based on the state and federal regulatory proceedings initiated by Ashley Creek because it was SF that had intervened in those proceedings. SF then amended its counterclaim to include an allegation that Ashley Creek had filed the underlying action with the improper ulterior motive of forcing SF to divest the pipeline. In the interim between the filing of Ashley Creek's motion to dismiss Chevron's counterclaim and the filing of Ashley Creek's motion to dismiss SF's counterclaim, this entire matter was reassigned to Judge Dale Kimball. Judge Kimball entered an order denying Ashley Creek's motion to dismiss SF's counterclaim for those reasons set forth by Judge Sam in denying Ashley Creek's motion to dismiss Chevron's identical counterclaim.

Judge Kimball thereafter granted summary judgment, as set forth above, to SF and Chevron on Ashley Creek's underlying federal claims; he directed the Clerk of the Court "to enter judgment accordingly and then close the case." Ashley Creek then appealed the district court's grant of summary judgment in favor of Chevron and SF and asserted in its docketing statement that the district court had resolved all claims as to all parties. Shortly thereafter, SF's counsel sent a letter to Judge Kimball noting that it had still had a counterclaim pending

and requesting that its pendent state law claim be dismissed without prejudice "[t]o avoid any confusion about the finality of the judgment being appealed." In support of this request, SF noted that pendent state law claims should be dismissed without prejudice when federal claims are dismissed before trial. *See Bauchman ex rel. Bauchman v. West High Sch.*, 132 F.3d 542, 549 (10th Cir. 1997). In an order dated March 13, 2001, the district court dismissed without prejudice Chevron's and SF's counterclaims and directed that its order of dismissal be entered *nunc pro tunc* as of the date of the judgment. In so doing, the district court expressly acknowledged that its prior order closing the case was erroneous because "[t]he SF Defendants and the Chevron Defendants still have counterclaims against Ashley Creek." Ashley Creek then filed a separate notice of appeal, appealing from the district court's dismissal of Chevron's and SF's counterclaims without prejudice, instead of with prejudice pursuant to its two motions to dismiss. That appeal is now before this court.

## II. Sufficiency of the Notice of Appeal

Chevron raises two separate challenges to the sufficiency of Ashley Creek's notice of appeal. First, Chevron appears to assert that Ashley Creek has not appealed the district court's decision denying its motion to dismiss Chevron's counterclaim because Ashley Creek did not specifically reference that order in its notice of appeal. Despite Chevron's failure to cite to any precedent or clearly

identify the basis of its claim, we assume that it is referring to the requirement in Fed. R. App. P. 3(c)(1)(B) that the notice of appeal "designate the judgment, order, or part thereof being appealed." Chevron's position in this regard was recently rejected by this court. *See McBride v. Citgo Petroleum Corp.*, 281 F.3d 1099, 1103-04 (10th Cir. 2002) (holding that a district court's interlocutory orders merge into its final orders and judgments and that the identification of the final order in the notice of appeal is sufficient to support appellate jurisdiction to review the earlier now-merged interlocutory orders).

Second, Chevron asserts that Ashley Creek's notice of appeal is untimely. *See* Chevron Brief, No. 01-4066, at 10 ("Ashley's motion to dismiss was denied well before the District Court granted appellees' summary judgment motions and dismissed Ashley's claims. Ashley appeals the dismissal of its claims in the main appeal. If it wanted also to appeal any other order entered prior to that dismissal, Ashley was required to do so as part of the main appeal."). The short answer to Chevron's assertion is that the order entered by the district court on January 25, 2001, directing the clerk to "close the case" was not a final order. As the district court itself recognized in its order of March 13, 2001, Chevron's and SF's state law counterclaims against Ashley Creek were still pending, as was Utah's derivative claim against Chevron. *See* Fed. R. Civ. P. 54(b) (providing that in the absence of a Rule 54(b) certification from the district court, "any order or other

-37-

form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties"). Accordingly, both the notice of appeal filed by Ashley Creek on January 26, 2001, and amended notice of appeal filed by Ashley Creek on February 6, 2001, were premature. When the district court finally adjudicated the remaining state law counterclaims and Utah's independent claim against Chevron in its order of March 13, 2001, the previously filed notices of appeal ripened and, along with the final notice of appeal filed by Ashley Creek on April 12, 2002, brought each of the issues asserted by Ashley Creek in these various appeals properly before the court. *See Lewis v. B.F. Goodrich Co.*, 850 F.2d 641, 645 (10th Cir. 1988) (en banc) ("In the situation like that before us, in which the other claims were effectively dismissed after the notice of appeal was filed, we believe Fed. R. App. P. 4(a)(2) permits the interpretation that the notice of appeal, filed prematurely, ripens and saves the appeal. . . . In such cases generally we will consolidate or companion the earlier appeal with any subsequent appeals arising out of the same district court case.").

## III. Article III Jurisdiction

Both Chevron and SF filed motions to dismiss this appeal on the ground that it is moot. They allege that the district court's subsequent dismissal of the counterclaims without prejudice mooted its earlier denial of Ashley Creek's

motions to dismiss because it is unclear whether the counterclaims will ever be refiled.[17]  Although SF's and Chevron's mootness arguments are at odds with Tenth Circuit precedent, this court does, nevertheless, perceive a jurisdictional problem with this appeal.  *See Qwest Communications Int'l, Inc. v. F.C.C.*, 240 F.3d 886, 891 (10th Cir. 2001) (holding that federal courts have an "independent obligation to examine their own jurisdiction" (quotation omitted)).

This court's decision in *Jarvis v. Nobel/Sysco Food Servs. Co.* easily disposes of Chevron's and SF's arguments that this appeal does not present a live case or controversy simply because there is no guarantee that they will ever refile their counterclaims in state court.  *See* 985 F.2d 1419 (10th Cir. 1993).  In *Jarvis*, the plaintiff brought both federal and state law claims against his employer.  *Id.* at 1421.  The district court granted a motion for summary judgment filed by the employer as to every claim except a state law retaliatory discharge claim.  *Id.*  As to that claim, the district court denied the employer's summary judgment motion

---

[17]*See, e.g.*, SF's Reply Memorandum in Support of Its Motion to Dismiss, at 2-3 ("Ashley Creek is appealing a 1998 Utah District Court decision denying Ashley Creek's motion to dismiss the SF Defendant's counterclaims on the pleadings.  On March 12, 2001, the district court dismissed these same claims without prejudice.  As a result of that dismissal, Ashley Creek's appeal no longer relates to a live case or controversy.  Since the SF Defendants may never refile the counterclaims, it is at best uncertain whether a ruling by this Court would have any effect.  Certainly, Ashley Creek cannot guarantee that any decision by this Court whether the district court should have dismissed the counterclaims because they were not pled properly would be anything but an academic exercise.").

on the merits. *Id.* Having dismissed all federal claims, the district court declined to exercise pendent jurisdiction over the state-law retaliatory discharge claim, dismissing the claim without prejudice. *Id.* at 1421-22. The plaintiff appealed the grant of summary judgment to the employer and the employer cross-appealed the district court's refusal to grant it summary judgment on the retaliatory discharge claim. *Id.* at 1422.

In resolving the employer's cross-appeal, this court began by noting a potential jurisdictional problem. *Id.* at 1424. *Jarvis* concluded that although the employer was a prevailing party as to the state-law retaliatory discharge claim because the claim had been dismissed, *albeit* without prejudice, the employer could still appeal the district court's earlier merits-based denial of its summary judgment motion as long as it could demonstrate a personal stake in the outcome of the appeal. *Id.* at 1424-25. Relying on the Supreme Court's decision in *Deposit Guaranty National Bank v. Roper*, 445 U.S. 326 (1980), this court held that if a successful appeal by the employer would alter, *inter alia*, future litigation costs, the "personal stake requirement of Article III was met." *Jarvis*, 985 F.2d at 1425; *see also id* ("In this case, a successful appeal by [the employer] would eliminate any possible re-filing of the retaliatory discharge claim in state court. As avoiding a state court suit would substantially reduce [the employer's] future litigation costs, we find that [the employer] has the requisite stake in the

appeal."). Accordingly, the *Jarvis* court concluded that "when a district court denies summary judgment on the merits, and then exercises its discretion to decline pendent jurisdiction, the moving party is a party aggrieved by a judgment and has an appeal as of right on the merits of the denial of summary judgment." *Id.* at 1425-26 (quotation and citation omitted).[18]

---

[18]In so ruling, the *Jarvis* court was careful to indicate that the result would have been entirely different if the district court had declined to rule on the merits of the employer's motion for summary judgment. *Jarvis v. Nobel/Sysco Food Servs. Co.*, 985 F.2d 1419, 1425 (10th Cir. 1993). In such a circumstance, the employer would have presented an issue not passed upon by the district court; appellate courts generally will not consider such issues in the first instance. *Id.* (citing *Pell v. Azar Nut Co.*, 711 F.2d 949, 950 (10th Cir. 1983)).

District courts would be wise to keep in mind the rule set out in *Jarvis* and *Pell* when faced with a complaint invoking the court's federal question jurisdiction which also includes pendent state law claims. As this court noted in *Bauchman ex rel. Bauchman v. West High Sch.*, 132 F.3d 542, 549 (10th Cir. 1997),

> The United States Supreme Court has counseled, pendent jurisdiction "need not be exercised in every case in which it is found to exist. . . . Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." [*United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)]. If federal claims are dismissed before trial, leaving only issues of state law, "the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice." [*Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 350 (1988); *Gibbs*, 383 U.S. at 726].

Taken together, *Jarvis*, *Pell*, and *Bauchman* counsel against deciding dispositive motions addressed to pendent state law claims unless it appears that a federal claim will proceed to trial or a decision is necessary because of some peculiar aspect of the case (e.g., coordination of trial docket and discovery). This is especially true where, as here, the state law the district court must apply to dispose of the motion is undeveloped. Absent such restraint, the parties may well be deprived of the "surer-footed reading of applicable law" that would be

In this case, it would appear that Ashley Creek's appeal of the district court's denial of its motion to dismiss fits comfortably within the rule announced in *Jarvis*. The district court denied Ashley Creek's motion to dismiss on the merits, concluding that Chevron's and SF's counterclaims stated claims for abuse of process which could be maintained as counterclaims under Utah law. It thereafter declined to exercise pendent jurisdiction and dismissed the counterclaims without prejudice. Because of the nature of the arguments presented by Ashley Creek on appeal, however, there is a real question whether the personal stake requirement of Article III is satisfied.

Although Ashley Creek asserts that the district court should have dismissed Chevron's and SF's counterclaims on the merits, it also continues to assert on appeal that the counterclaims were never proper counterclaims under Utah law. In *Gilbert v. Ince*, 981 P.2d 841, 844-46 (Utah 1999), the Utah Supreme Court adopted the analytical framework set out in the Restatement (Second) of Torts for distinguishing between the following three distinct torts involving abusive manipulation of judicial procedures: (1) abuse of process; (2) malicious prosecution; and (3) wrongful use of civil proceedings. Despite the fact that it had in the past utilized the term "as a catch-all description of any private misuse of judicial resources," the court recognized that abuse of process is a narrow tort

provided them by the relevant state court. *Gibbs*, 383 U.S. at 726.

applying only to "'[o]ne who uses a legal process . . . against another primarily to accomplish a purpose for which it is not designed.'" *Id.* at 845 (quoting Restatement (Second) of Torts § 682 (1977)). An abuse of process claim can be raised as a counterclaim under Utah law because there is no requirement that the judicial proceedings giving rise to the tort claim have been terminated in the counterclaimant's favor. *See* Restatement (Second) of Torts § 682 cmt. a (1977); William L. Prosser, *Law of Torts* § 121, at 856 (4th ed. 1971); *Keller v. Ray, Quinney & Nebeker*, 896 F. Supp. 1563, 1570 & n.15 (D. Utah 1995) (cited with approval in *Ince*, 981 P.2d at 846).[19] The tort of wrongful use of civil

_____

[19]This is so because
> [t]he gravamen of the misconduct . . . is not the wrongful procurement of legal process or the wrongful initiation of criminal or civil proceedings; it is the misuse of process, no matter how properly obtained, for any purpose other than that which it was designed to accomplish. Therefore, it is immaterial that the process was properly issued, that it was obtained in the course of proceedings that were brought with probable cause and for a proper purpose, or even that the proceedings termination in favor of the person instituting or initiating them. The subsequent misuse of the process, though properly obtained, constitutes the misconduct for which the liability is imposed under th[is] rule . . . ."

Restatement (Second) of Torts § 682, cmt. a (1977); *see also* William L. Prosser, *Prosser on Torts* § 121, at 856 (4th ed. 1971) ("[T]he gist of the tort [of abuse of process] is not commencing an action or causing process to issue without justification, but misusing, or misapplying process justified in itself for an end other than that which it was designed to accomplish. The purpose for which the process is used, once it is issued, is the only thing of importance. Consequently, . . . it is unnecessary for the plaintiff to prove that the proceeding has terminated in his favor . . . ." (footnote omitted)).

-43-

proceedings, in contrast, focuses on the whether the *procurement, initiation, or continuation* of civil proceedings was "for the purpose of harassment or annoyance" and without probable cause. *Ince*, 981 P.2d at 846 (quotation omitted); *see also* Restatement (Second) of Torts § 674 (1977). *See generally* William L. Prosser, *Law of Torts* § 120, at 850-851 (4th ed. 1971) ("The action of malicious prosecution, which began as a remedy for unjustifiable criminal proceedings, has been undergoing a slow process of extension into the field of the wrongful initiation of civil suits."). A claim for wrongful use of civil proceedings is not ripe until the underlying proceedings are "'terminated in favor of the person against whom they are brought.'" *Ince*, 981 P.2d at 845 (quoting Restatement (Second) of Torts § 674 (1977)).

Whether Chevron's and SF's counterclaims are properly categorized as sounding in abuse of process or wrongful use of civil proceedings answers in part the question whether Ashley Creek's appeal satisfies the personal stake requirement of Article III. If the counterclaims state a claim for abuse of process, they were properly brought as counterclaims and, pursuant to *Jarvis*, this court would have jurisdiction to determine whether the district court properly denied Ashley Creek's motion to dismiss the counterclaims with prejudice. This is so because a ruling in Ashley Creek's favor would prevent the refiling of the claims in state court and, thereby, reduce or eliminate Ashley Creek's future litigation

-44-

costs. *Jarvis*, 985 F.2d at 1425. If, on the other hand, Ashley Creek is correct that the counterclaims state only claims for wrongful use of civil proceedings, Article III's personal stake requirement is not satisfied unless the underlying proceedings were terminated in Chevron's and SF's favor. *See* Restatement (Second) of Torts § 674(b) (1977); *Ince*, 981 P.2d at 846 (adopting Restatement formulation of wrongful use of civil proceedings); *Keller*, 896 F. Supp. at 1570 n.15 (applying Utah law).[20] If the counterclaims in question are for wrongful use of civil proceedings and the underlying proceedings have not been terminated in Chevron's and SF's favor, the appropriate response to Ashley Creek's motion to dismiss the counterclaims would be to dismiss the counterclaims without prejudice. Because this is exactly what the district court eventually did when it declined to exercise pendent jurisdiction, this court could provide Ashley Creek no further relief and the appeal would not present a live case or controversy.

---

[20]*Cf. also Mann v. Genoa Township*, No. 01CAE03011, 2002 WL 221112, at *4 (Ohio Ct. App. Feb. 11, 2002) (holding that trial court erred in dismissing malicious prosecution claim on merits where claim was not ripe); *Brown v. Bethlehem Terrace Assocs.*, 525 N.Y.S.2d 978, 979 (N.Y. App. Div. 1988) (holding that defendant's counterclaim for abuse of process actually stated claim for malicious prosecution and that claim was not ripe for adjudication as a counterclaim); *Neil v. S. Fla. Auto Painters, Inc.*, 397 So.2d 1160, 1166 (Fla. Dist. Ct. App. 1981) (noting that a malicious prosecution claim does not ripen until the termination of the underlying proceedings supposedly giving rise to the claim).

As noted above, Ashley Creek contends on appeal that Chevron's and SF's counterclaims sound in wrongful use of civil proceedings rather than in abuse of process. Chevron and SF did not respond to this contention in their appellate filings. For the most part, this court agrees with Ashley Creek. Chevron's and SF's counterclaims state the following three general allegations: (1) the underlying antitrust action was brought in bad faith and without a justifiable basis for the purpose of obtaining a preferential tariff; (2) the underlying antitrust action was brought in bad faith and without a justifiable basis in an effort to gain an equity interest in the pipeline; and (3) Ashley Creek had involved the counterclaimants in extensive and costly litigation in state and federal agencies and state court for the purpose of seeking disallowance of the pipeline right-of-way, which proceedings Ashley Creek had lost. It is clear that the first two categories of these allegations, which refer to the initiation of the underlying antitrust lawsuit, rather than to the improper use of otherwise properly issued process, state wrongful use of civil proceedings claims which, as correctly noted by Ashley Creek on appeal, cannot be maintained as counterclaims. *See Brown*, 525 N.Y.S.2d at 980 (noting that "institution of a civil action by summons and complaint is not legally considered process capable of being abused" (quotation omitted)). Because the district court's ultimate dismissal of those claims without prejudice is all the relief to which Ashley Creek is entitled, its appeal of the

district court's treatment of those claims does not present a live case or controversy to this court. Chevron's and SF's claims regarding proceedings in state and federal administrative tribunals and Utah state court regarding the validity of the right-of-way over which the pipeline travels, however, are ripe no matter how viewed because all of the proceedings referred to have been terminated in Chevron's and SF's favor. Accordingly, this court has jurisdiction to review the district court's refusal to dismiss those claims with prejudice.

## IV. Merits

SF's ripe counterclaim provides as follows[21]:

> 6. Counterclaim Defendant has involved the Counterclaimants in extensive litigation causing large expense in fees and costs, including the following:
> (a) Proceedings before the Utah State agencies, the Utah Third District Court and the Utah Supreme Court seeking disallowance of Utah State easements for the pipeline over state land and has lost all of such proceedings.
> (b) Proceedings before the divisions of the United States Department of Interior resulting ultimately in an appeal by Counterclaim Defendant to the Interior Bureau of Land Appeals and has lost all such proceedings which have become final.
> Because of the foregoing, the Counterclaimants are entitled to their attorney's fees and costs in defending all of the suits and proceedings described above.

---

[21]Chevron's ripe counterclaim is identical in substance and substantially similar in text.

This court reviews the denial of a Rule 12(b)(6) motion to dismiss *de novo*, applying the same standard as the district court, and accepting the well-pleaded allegations of the complaint as true and construing them in the light most favorable to the counterclaimants. *Benefield v. McDowall*, 241 F.3d 1267, 1270 (10th Cir. 2001).

With these standards in mind, we conclude that the district court erred in denying Ashley Creek's motion to dismiss this particular wrongful use of civil proceedings claim because the claim is deficient on its face. Although Chevron and SF alleged that Ashley Creek involved them in administrative and state court litigation regarding the validity of the pipeline right-of-way, they do not allege that such litigation was undertaken without probable cause and for an improper purpose. *See Ince*, 981 P.2d at 846 (setting out essential elements of wrongful use of civil proceedings claim); Restatement (Second) of Torts § 674 (1977); *id.* § 681A (noting that it is plaintiff's burden to prove lack of probable cause and improper purpose). Instead, the counterclaim merely alleges that Ashley Creek involved Chevron and SF in costly litigation which Ashley Creek ultimately lost. This is in stark contrast to the other two segments of Chevron's and SF's counterclaims which specifically allege both the lack of probable clause and improper purpose elements. Accordingly, taking as true the allegations set out in this one segment of the counterclaims, and drawing all reasonable inferences in

-48-

favor of Chevron and SF, the counterclaims fail to state a viable claim upon which relief could be granted.[22]

## V. Conclusion

The district court's order denying Ashley Creek's motion to dismiss Chevron's and SF's counterclaims related to litigation involving the validity of the right-of-way is hereby **reversed** and the matter is **remanded** to the district court to dismiss the claims with prejudice. The remainder of the appeal is dismissed for lack of Article III jurisdiction.

## CONCLUSION

For those reasons set out above, the United States District Court for the district of Utah is hereby **AFFIRMED** in Nos. 01-4017 and 01-4031. In No. 01-4066, the appeal is **DISMISSED** in part, the district court is **REVERSED** in part, and the matter is **REMANDED** to the district court for further proceedings consistent with this opinion. All other outstanding motions are hereby **DENIED**.

---

[22]Because this court concludes that this aspect of Chevron's and SF's counterclaims is facially deficient, we need not address Ashley Creek's contention that the claim fails because Chevron and SF were actually intervenors in the relevant proceedings.